IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| R.F., *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| vs. | *  Civil Action No.  ADC-17-2203 |
| | * |
| CECIL COUNTY PUBLIC SCHOOLS, | * |
| | * |
| Defendant. | * |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OPINION

Defendant, Cecil County Public Schools ("Defendant"), moves this Court for summary judgment in its favor and against Plaintiffs, R.F., a minor child, and her parents (collectively, "Plaintiffs"),[1] ("Defendant's Motion") (ECF No. 30). Defendant seeks a ruling from the Court that Plaintiffs cannot prevail on their claims for deprivation of a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA") and disability discrimination under § 504 of the Rehabilitation Act of 1973 ("§ 504"). Plaintiffs filed an opposition to Defendant's Motion and cross-motion for summary judgment ("Plaintiffs' Cross-Motion) (ECF No. 31).

After considering the motions and responses thereto (ECF Nos. 32 & 35), the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2016). In addition, having reviewed the pleadings of record and all competent and admissible evidence submitted by the parties, the Court finds that there is no genuine issue of material fact as to the claims asserted and that there is insufficient evidence from which a jury could find in Plaintiffs' favor on the deprivation of a

---

[1] R.'s parents filed this suit on her behalf.

FAPE and disability discrimination claims. Accordingly, the Court will GRANT Defendant's Motion (ECF No. 30) and DENY Plaintiffs' Cross-Motion (ECF No. 31).

## FACTUAL BACKGROUND

This lawsuit arises out of Plaintiffs' allegations that Defendant failed to offer R. a FAPE under IDEA for the 2016–2017 school year and discriminated against R. based on her disability in violation of § 504. Plaintiffs further asserted that the Administrative Law Judge ("ALJ") who presided over R.'s due process hearing erroneously applied the law, erred in her factual findings, and erred in determining that Defendant had offered R. a FAPE for the 2016–2017 school year. The facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Here, both parties rely upon the factual findings laid out in the administrative decision issued on May 3, 2017, except to the extent that such factual findings state or incorporate legal findings. *See* ECF Nos. 30-1 at 5 & 31-1 at 12.

R. was born on June 15, 2009 and, thus, at the time of the administrative decision, R. was a seven-year-old girl. ECF No. 30-2 at 4; *see* ECF No. 31 at 1. In 2013, R. was diagnosed with a genetic disorder related to mutation in the HIVEP2 gene, an extremely rare condition with unknown long-term consequences, including those related to learning to perform activities of daily living, processing information, and understanding and expressing language. ECF No. 30-2 at 4. In March 2016, R. was diagnosed with severe autism spectrum disorder at one of the most intensive levels. *Id.* R. has also been diagnosed with several other disorders, including, *inter alia*, global developmental delay and an intellectual disability. *Id.* She exhibits complex, challenging, disruptive behaviors, including hyperactivity and impulsivity which are difficult to control even with medication as well as grabbing people, pulling hair, biting, and placing her

mouth on others without biting down. *Id* at 5. R. is nonverbal in that she does not regularly use words to communicate and expresses no recognizable speech other than "Mommy," which she sometimes uses toward her mother. *Id* at 4–6. R. also has significant neuromuscular deficits, including hypotonia. *Id* at 5. R. requires adult supervision and assistance at all times, including when toileting, washing her hands, and managing her clothes. *Id*

R. was identified as a student qualifying for special education and related services and began receiving services through the Maryland State Department of Education's ("MSDE") Infants and Toddlers program when she was two years old under the primary disability of "developmental delay." *Id* at 6–7. From 2012 to 2013, R. attended a part-day preschool. ECF No. 31-1 at 8.

Defendant developed R.'s first individualized education program ("IEP") on June 4, 2014. ECF No. 30-2 at 6. During the 2014–2015 school year, R. attended half-day kindergarten and Defendant provided her with speech and language, occupational, and physical therapy. *Id* The majority of R.'s educational program was in general education classes. Defendant further provided R. with extended school year ("ESY") services during the summer of 2015. *Id*

In May 2015, R.'s IEP was approved after an IEP team meeting. *Id* The May 2015 IEP identified R. as a student with the primary disability of developmental delay and identified the areas affected by her disability as "Early Math Literacy, Reading Comprehension, Speech and Language Expressive and Receptive Language, Behavioral (sensory), and Physical (endurance and gross motor)." *Id* at 7. The May 2015 IEP contained goals and objectives in academic, speech and language, physical, and endurance areas. *Id*

R.'s IEP was reviewed and revised on July 30, 2015 in order to discuss R's ESY services and the status of her progress since her May 2015 IEP. *Id* The IEP team agreed that during the

3

2015–2016 school year, R. should be placed in the regular early childhood education program of full-day kindergarten with the majority of her special education services provided outside of the general education classroom because they could not be provided in the regular classroom. *Id.* at 7–8. Accordingly, the IEP provided that R. would receive educational services outside of the general education classroom for two and a half hours per week and the rest of the week—twenty-nine hours—she would receive services in the general education setting.[2] *Id.* at 8.

During the 2015–2016 school year, R. had class with twenty-one students and a paraprofessional accompanied her at all times. *Id.* She received special education and related services pursuant to her IEP. *Id.* On February 9, 2016, R.'s IEP was revised at an IEP team meeting, which included Mrs. F., R.'s mother, to reduce R.'s IEP Speech and Receptive Language goal. *Id.* at 8. Also during this meeting, Mrs. F., as well as R.'s physical therapist, occupational therapist, speech language pathologist, and special education teacher, said that R. was making progress toward her annual goals. *Id.*

In the spring of 2016, Defendant ordered multiple assessments, which revealed, *inter alia*, that R. performed at an extremely low level and demonstrated clinically significant behaviors in the school setting, including hyperactivity and aggression. *Id.* at 9, 11. Based on these assessments, the IEP team concluded that R. met the criteria for autism spectrum disorder. *Id.* at 11. Defendant also retained a psychologist with expertise in students with significant disability and autism to create a model functional behavior assessment ("FBA") and train Defendant's staff to conduct FBAs. *Id.* at 9. Because R. displayed significant behavior difficulties, Defendant's staff conducted a FBA of R., which indicated that the primary interfering behavior was biting, and, on April 13, 2016, Defendant's staff created a behavior

---

[2] The school week for Defendant's elementary schools consists of a total of 31 hours and 30 minutes. ECF No. 30-2 at 16.

intervention plan ("BIP") which listed specific steps that school personnel should take to prevent unwanted behaviors as well as steps for behavior intervention. *Id.* at 9–10.

Defendant shared and discussed the FBA with Mrs. F. at the IEP team meeting on May 25, 2016. *Id.* at 9, 12. In addition to a medical report dated March 16, 2016, the IEP team considered input from Mrs. F, observations, and the results of several tests and assessments in revising R.'s IEP. *Id.* at 12. Revisions to R.'s IEP included changing her primary disability from developmental delay to multiple disabilities, including autism, and modifying the academic, behavioral, early learning skills, and physical sections of the IEP. *Id.* at 12–13. The IEP team also reevaluated R. in the areas of academics, expressive and receptive language, fine motor, gross motor, behavior, and functional behavior. *Id.* at 13. After reviewing and documenting R.'s present level of academic achievement and behavioral and functional performance, the IEP team included supplementary aids and accommodations in the IEP to enable R. to communicate and access her education, including using a NovaChat device, an assistive technology device for communication, and receiving simple verbal communication, highly engaging visuals, and hands-on tasks and activities from Defendant's staff. *Id.* at 13–14. In the area of behavior intervention, specifically relating to R.'s biting, hair pulling, lying on the floor, and kicking, the IEP team decided that R.'s BIP would be implemented. *Id.* at 14. Furthermore, the IEP team concluded that R. did not achieve the goals on her kindergarten IEP. *Id.* at 15.

Based on the IEP team's discussion and review of the assessments, the team created a fifty-one page IEP containing thirteen goals, each with supporting objectives designed to meet R.'s complex needs as well as specified evaluation methods and a targeted accuracy rate, to address all of R.'s identified special needs. *Id.* at 16. No social skills, however, were included. *Id.* The IEP team agreed that, in order to work on her IEP goals, R. would spend three hours and

5

forty-five minutes per week outside the general education setting, five hours per week in the general education setting, thirty minutes twice per week doing occupational therapy, thirty minutes twice a week doing physical therapy, and twenty minutes five times per week doing speech or language therapy. *Id.* Overall, the IEP team decided that R. would spend a total of fourteen hours and thirty-five minutes per week in the general education setting and sixteen hours and fifty-five minutes per week outside of general education. *Id.* Mrs. F. disagreed with the goals and objectives and the decision to place R. in one of Defendant's schools and she advocated against including R. in classes with her nondisabled peers. *Id.* at 17. Instead, Mrs. F. requested that Defendant place R. at The Benedictine School, a private day school, at Defendant's expense. *Id.* The IEP team disagreed and wanted R. to participate in a new program Defendant was developing for an intensive communication classroom at a yet-determined location with a yet-determined class size. *Id.*

Defendant provided ESY services for R. over the summer of 2016. *Id.* at 16. On July 7, 2016, the IEP team met to review R.'s progress since the May IEP meeting, including Defendant's latest assessment of R.'s abilities. *Id.* at 17–21. At that time, Defendant identified R.'s service placement at one of Defendant's elementary schools in an Intensive Communication Support Classroom ("ICSC") with a special program emphasizing communication goals for the 2016–2017 school year. *Id.* at 17, 22.

For the 2016–2017 school year, Defendant hired Mr. K to provide special education services in the ICSC, which had low lights and calming music to focus R. and promoted a "teach model" of consistent routine instruction in established locations around the classroom, and generalized support services throughout the school day. ECF Nos. 30-1 at 14 & 30-2 at 22. R. was also provided with her own paraprofessional who stayed with her throughout the day to

6

assist as needed. ECF No. 30-2 at 22. From August 2016 until October 2016, R. was the only student in the ICSC, and after October 2016, another student came into the ICSC for a portion of the afternoon. *Id.* Defendant did not plan for R. to be the only child in the ICSC, but the other children who were expected to participate did not attend during the fall of 2016 for reasons beyond Defendant's control. *Id.* Starting in February 2017, one other student attended the ICSC with R. *Id.* Throughout the 2016–2017 school year, however R. did have access to her nondisabled peers when she walked to specials (*e.g.*, gym, art, and music class), attended recess, went on field trips, attended some reading and math classes, walked around the building every day, and was occasionally joined by a first grade classmate during lunch.[3] *Id.* at 22–23.

Moreover, at the beginning of the 2016–2017 school year, R. had difficulty staying seated and quiet in the general education classroom for academic subjects and walking to the classroom. *Id.* at 23. About three weeks after school started, Mr. K began providing R. with more instruction in the ICSC classroom so that she did not have to walk to the general education classroom and because she could focus and remain attentive for longer periods of time in the ICSC classroom. *Id.* Thus, from this time until a December 2016 IEP meeting, R. received more than eight hours and forty-five minutes of specially designed instruction to work on her IEP goals every day and she spent more hours in the special education classroom and fewer hours in the general education setting than specified in the Placement section of her IEP. *Id.* No IEP meeting occurred to discuss these changes with R.'s parents.

---

[3] From the beginning of the school year until about mid-October, R. ate lunch with nondisabled students in the lunchroom, but then she started eating in the ICSC classroom to encourage her to consume her whole lunch and not get distracted from eating. *Id.* at 23.

Also during the fall of 2016, Defendant implemented R.'s BIP regularly, but sometimes R.'s NovaChat was not within her reach. *Id.* at 25. Moreover, at times, Mr. K did not follow the specific steps in the BIP for behavior intervention. *Id.*

On December 16, 2016, the IEP team held an IEP team meeting also attended by Mrs. F, an expert in special education, and Mrs. F.'s attorney. *Id.* The IEP team considered R.'s significant delays and deficits in academic and communication skills and determined that she required specially-designed instruction outside of the general education setting because of her distractibility and the need to focus her attention, but that she still needed some of her academic services inside general education to provide modeling of language and to facilitate generalization of skills. *Id.* The IEP team also determined that R. required occupational and physical therapy outside of general education. *Id.* Mrs. F. again disagreed with the IEP goals and objectives and R.'s placement, requesting instead that R. not be included in the general education setting at all during the school day. *Id.* at 26. Mrs. F. expressed concern that R. was not with disabled peers most of the day when she was outside of the general education setting. *Id.* Mrs. F. also presented a consultant's report which recommended that R. attend a full-day program for children with autism at The Benedictine School at public expense with full-day ESY services. *Id.*

Defendant proposed reducing R.'s time in general education so that she would only attend specials with nondisabled peers and not attend general education sessions in the general education classroom in the afternoon. *Id.* R.'s parents disapproved of Defendant's proposal. *Id.* After further discussion, R.'s IEP was revised such that (1) the Services section was changed to reduce the hours spent working on R.'s goals within the general education setting from five hours to two hours and thirty minutes and to increase the time spent outside of the general

education setting from three hours and forty-five minutes to six hours and fifteen minutes per week;[4] and (2) the Placement section was changed to increase the hours R. spent in the ICSC special education setting from sixteen hours and fifty-five minutes to twenty-nine hours per week. *Id.* at 26–27.

During the 2016–2017 school year, Mr. K collected bimonthly data in class regarding R.'s progress toward her goals. *Id.* at 27. Contrary to Defendant's policies requiring teachers to collect data twice per quarter and maintain data for two years, Mr. K did not keep his notes. *Id.* Instead, he destroyed them once he wrote R.'s quarterly progress reports, which were prepared in lieu of letter or numeric grades. *Id.* R. made progress toward achieving some of her IEP goals during the 2016–2017 school year, including several physical and speech and language areas, but not toward achieving her behavior and academic goals. *Id.* at 27–30.

## PROCEDURAL BACKGROUND

On January 17, 2017, Plaintiffs filed a Due Process Complaint with the Maryland Office of Administrative Hearings, requesting a hearing to review the identification, evaluation, and placement of R. by Defendant under IDEA during the 2015–2016 and 2016–2017 school years. ECF No. 30-2 at 1. After a fruitless resolution session, the parties attended an administrative hearing held before an ALJ on March 10, 22, 28, 29 and April 4, 2017. *Id.* at 1–2. On May 3, 2017, the ALJ issued a decision (ECF No. 30-2), summarizing the evidence and finding that Defendant procedurally violated IDEA by altering the location in which some of R.'s services were provided without first notifying her parents, but that despite that violation, Defendant had

---

[4] Unlike other school systems which record service hours as the entire time a student is with a special education teacher in a special education program, Defendant's recorded hours are the amount of instruction that focuses on meeting the student's IEP goals. ECF No. 30-1 at 12–13. To calculate the number of service hours, Defendant uses the amount of specially designed instruction that the IEP team feels is required for that student to make progress on his or her IEP goals. *Id.* at 12.

9

not deprived R. a FAPE because the IEP and placement created and implemented for R. by Defendant was reasonably calculated to offer R. a FAPE. *Id.* at 69. Thus, the ALJ denied Plaintiffs' request to have R. placed at The Benedictine School or another private day school at public expense. *Id.*

On August 4, 2017, Plaintiffs filed suit in this Court against Defendant and two individuals in their official capacity (collectively, "Defendants"), alleging violations of IDEA, § 504, and 42 U.S.C. § 1983. ECF No. 1 ("the Complaint"). Specifically, Plaintiffs alleged that the adverse decision by the ALJ "was not regularly made" and contained erroneous legal findings, that Defendants intentionally discriminated against students with disabilities, specifically students like R., and that Defendants violated R.'s rights under 42 U.S.C. § 1983. *Id.* at 10–12. The Complaint sought declaratory and injunctive relief plus damages. *Id.* at 13–14.

On August 30, 2017, Defendants moved for partial dismissal, asking that (1) the IDEA and § 504 claims be dismissed as to the individual defendants sued in their official capacity because these statutes do not provide a cause of action against individuals and (2) the § 1983 claim be dismissed as to all Defendants because county school boards are state agencies and state agencies, as well as state officials acting in their official capacity, cannot be sued under § 1983. ECF No. 10-1 at 4–7. Plaintiffs replied to Defendants' motion to dismiss, stating that they did not oppose the dismissal of the individual parties or the § 1983 claim. ECF No. 13 at 2. Accordingly, on October 13, 2017, this Court granted Defendants' partial motion to dismiss, dismissing the two individual parties and Plaintiffs' § 1983 claim. ECF No. 15 at 2. Subsequently, Defendants filed an answer (ECF No. 14) and discovery commenced.

On March 9, 2018, Defendant filed Defendant's Motion (ECF No. 30), seeking summary judgment against Plaintiffs for depriving R. a FAPE under IDEA and discriminating against her

10

based on her disability in violation of § 504.[5] On April 6, 2018, Plaintiffs filed their opposition and Plaintiffs' Cross-Motion (ECF No. 31) seeking summary judgment in their favor. Plaintiffs filed a reply and opposition (ECF No. 32) on April 26, 2018, and Defendant filed a reply (ECF No. 35) on May 21, 2018. This matter is now fully briefed and the Court has reviewed each party's cross-motion for summary judgment. For the foregoing reasons and pursuant to Federal Rule of Civil Procedure 56(a), Defendant's Motion (ECF No. 30) is granted and Plaintiffs' Cross-Motion (ECF No. 31) is denied.

## STANDARD OF REVIEW

### A. IDEA Claim

In considering cross-motions for summary judgment in an IDEA case, the "reviewing court is obliged to conduct a modified *de novo* review of the administrative record, giving due weight to the underlying administrative proceedings." *M.L. ex rel. Leiman v. Starr*, 121 F.Supp.3d 466, 474 (D.Md. 2015) (internal quotation marks omitted) (quoting *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D.Md. Dec. 29, 2014)), *aff'd*, 867 F.3d 487 (4th Cir. 2017). This standard means that a reviewing court must consider an ALJ's findings of fact "*prima facie* correct" when they are made "in a regular manner and with evidentiary support." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). "In determining whether such factual findings were 'regularly made,' a reviewing court 'should examine the way in which the state administrative authorities have arrived at their administrative decisions and the methods employed.'" *E.P. ex rel. J.P. v. Howard Cty. Pub. Sch. Sys.*, ELH-15-3725, 2017 WL 3608180, at *6–7 (D.Md. Aug. 21, 2017) (citation omitted), *appeal docketed*, No. 17-2094 (2017).

---

[5] On November 7, 2017, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States Court for the District of Maryland and upon consent of the parties, this case was transferred to United States Magistrate Judge A. David Copperthite for all proceedings. ECF No. 19.

11

"Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover, Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008) (quoting *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005)). If a district court "is not going to follow the[ ALJ's findings], [it] is required to explain why it does not." *Doyle*, 953 F.2d at 105.

Once the reviewing court has given the administrative fact-findings due weight, "[t]he Court then reaches its decision based on the preponderance of the evidence." *M.L*, 121 F.Supp.3d at 474 (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "A district court may, for example, 'believe that the evidence considered as a whole points to a different legal conclusion,'" despite accepting the factual findings of the ALJ. *E.P.*, 2017 WL 3608180, at *7 (citation omitted). "In making its determination, however, districts courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* Thus, the reviewing court must make an "independent determination" regarding whether the school complied with IDEA. *M.L.*, 121 F.Supp.3d at 493 (citation omitted); *see Doyle*, 953 F.2d at 103 ("Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." (citation omitted)). Moreover, in IDEA cases such as this one, in which the plaintiffs are appealing the administrative decision below, the plaintiffs "face an uphill battle for several reasons," not only because they must bear the burden of proof with respect to the evidence both in the administrative hearing and on appeal, but also because of the degree of deference owed to the administrative proceedings. *Wagner v. Bd. of Educ. of Montgomery Cty., Md.*, 340 F.Supp.2d 603, 611 (D.Md. 2004).

Importantly, this standard of review "works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases." *M.L.*, 121 F.Supp.3d at 475 (quoting *M.C.*, 2014 WL 7404576, at *7). Summary judgment is therefore warranted when the moving party demonstrates, through reference to materials in the record, that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also M.L.*, 121 F.Supp.3d at 475 (discussing Rule 56(a) in the context of summary judgment in IDEA cases). "If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts." *M.L.*, 121 F.Supp.3d at 475. In the case of cross-motions for summary judgment, the court views each motion "in a light most favorable to the non-movant." *Id.* (quoting *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D.Md. Aug. 28, 2009)).

## B. Disability Discrimination Claim

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*

*v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

Here, both parties moved for summary judgment. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). The fact that both sides moved for summary judgment "neither establish[es] the propriety of deciding a case on summary judgment, nor establish[es] that there is no issue of fact requiring that summary judgment be granted to one side or another." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 511 n.7 (4th Cir. 2002) (internal citations and quotation marks omitted). "The court must deny both motions if it finds there is a genuine dispute of material fact, 'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *Rashid v. Wash. Metro. Area Transit Auth.*, No. DKC 17-0726, 2018 WL 1425978, at \*4 (D.Md. Mar. 22, 2018) (citation omitted).

14

This Count has succinctly summarized the two statutes at issue in this case as follows:

> Congress has enacted two statutes that focus, in some measure, on ensuring that students with disabilities have access to a free public education equal to that of non-disabled students. The first is the [IDEA], 20 U.S.C. §§ 1400 *et seq.* (2012). The IDEA requires, among other things, that states accepting federal funds provide a [FAPE] to students with disabilities. § 1412(a)(1). A "[FAPE]" entails special education and related services that are provided to the student without charge, but also meet state educational standards and conform to an [IEP] developed specifically for that student. § 1401(9). As a baseline, the education provided to the student under the IDEA must confer some educational benefit. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).
>
> The second such statute is [§] 504. Unlike the IDEA, [§] 504 is an antidiscrimination statute. Section 504 prohibits federally funded programs from discriminating against an otherwise qualified individual solely on the basis of her disability. 29 U.S.C. § 794(a)[.] As part of this requirement, federal regulations implementing [§] 504 mandate that schools provide a [FAPE] to students with disabilities. 34 C.F.R. § 104.33. To meet the [FAPE] requirement under [§] 504, schools must provide, at no cost, regular or special education and related aids and services designed to meet the needs of the student. §§ 104.33(b), (c). Like the IDEA, this is achieved through an accommodations plan, § 104.35, but the [FAPE] requirement differs from the IDEA in that the measure of whether the education conferred under [§] 504 is sufficient is that it must meet the student's needs "as adequately" as the needs of a non-disabled student[,] §§ 104.33(b), (c). *See Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008).

*K.D. ex rel. J.D. v. Starr*, 55 F.Supp.3d 782, 783–84 (D.Md. 2014) (footnote omitted). In this case, Defendant argues that it is entitled to summary judgment because Plaintiffs cannot establish their claims under either of the statues because Defendant did not violate IDEA and no reasonable fact finder could make a finding of gross misjudgment or bad faith regarding Plaintiffs' IDEA claim, which Plaintiffs "repackag[ed]" for their § 504 claim. ECF No. 30-1 at

17–26. Plaintiffs, on the other hand, argue that they are entitled to summary judgment because the ALJ erred in finding that Defendant did not deny R. a FAPE and they have established that Defendant discriminated against R. in violation of § 504 by isolating her from her peers for much of the school year. ECF No. 31-1 at 19–40. For the reasons below, the Court will grant Defendant's Motion and deny Plaintiffs' Cross-Motion.

## A. Defendant, Not Plaintiffs, Is Entitled To Summary Judgment On The IDEA Claim.

In Count I of their Complaint, Plaintiffs contend that during the 2016–2017 school year, R. was deprived a FAPE under the IDEA. ECF No. 1. Congress enacted the IDEA, in part, "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C.A. § 1400(d)(1)(A) (West 2018); *see also E.P.*, 2017 WL 3608180, at *2 ("Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided 'a [FAPE] which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected.'" (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009))). Accordingly, the IDEA requires all states receiving federal funds for education to provide disabled schoolchildren with a FAPE. 20 U.S.C.A. § 1412(a)(1)(A) (West 2018). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–89. The appropriate education required, by the IDEA, however, should not be confused

> with the best possible education. And once a FAPE is offered, the school district need not offer additional educational services. That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the

16

> handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.

*MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 526–27 (4th Cir. 2002) (citations, internal quotation marks, and alterations omitted). Although the IDEA does not require that a state provide the best education possible, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance Cty. Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985).

In *Rowley*, the Supreme Court set out a two-part test to determine if a local educational agency had satisfied its obligation under the IDEA to provide a FAPE to a student with a disability. 458 U.S. at 206–07. The court must determine, first, whether the State complied with IDEA procedures, and, second, whether the IEP developed through proper procedures is "reasonably calculated to enable the child to receive educational benefits." *Id.*; *see also In re Conklin*, 946 F.2d 306, 313 (4th Cir. 1991). "A school provides a FAPE by developing an [IEP] for each disabled child." *Z.P.*, 399 F.3d at 300; *see* 20 U.S.C.A. § 1401(9)(D) (West 2018) (defining FAPE as "special education and related services that are provided in conformity with the [IEP]"). An IEP is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *E.P.*, 2017 WL 3608180, at *3 (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017)). IEPs "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM*, 303 F.3d at 527 (citing 20 U.S.C. § 1414(d)(1)(A)). An IEP is sufficient if it is "reasonably calculated to enable the child to receive educational

17

benefits." *Rowley*, 458 U.S. at 207. Moreover, "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *E.P.*, 2017 WL 3608180, at *3 (quoting *Endrew F.*, 137 S.Ct. at 1001).

Defendant contends that the ALJ's decision was regularly made and that the ALJ did not err as a matter of law in finding that Defendant provided R. a FAPE for the 2016–2017 school year. ECF No. 30-1 at 17–24. Plaintiffs disagree, arguing that Defendant procedurally violated IDEA by unilaterally changing R.'s IEP, failing to follow the State guidelines for recording hours of instruction on the IEP, and denying R.'s parents the ability to participate in the decision-making process through a teacher's destruction of the data used to measure R.'s progress. ECF No. 31-1 at 20–24. Moreover, Plaintiffs argue that the ALJ erred as a matter of law in finding that the BIP was appropriate and that the IEP was substantively appropriate. *Id.* at 24–40. These alleged errors will be addressed below.

    1. Despite committing procedural errors, Defendant provided R. with a FAPE.

"Procedural violations committed by the hearing officer at a due process hearing only violate the IDEA if they 'result in the loss of educational opportunity.'" *E.P.*, 2017 WL 3608180, at *8 (quoting *B.G. ex rel. J.A.G. v. City of Chi. Sch. Dist. 299*, No. 15 C 6372, 2017 WL 1049466, at *11 (N.D.Ill. Mar. 20, 2017)); *see also Gray ex rel. Gray v. O'Rourke*, 48 F.App'x 899, 901 & n.6 (4th Cir. 2002) (per curiam); *Burke Cty. Bd. of Educ. v. Denton ex rel. Denton*, 895 F.2d 973, 982 (4th Cir. 1990). As the Fourth Circuit explained in *DiBuo ex rel. DiBuo v. Board of Education of Worcester County*, "to the extent that the procedural violations did not actually interfere with the provision of a [FAPE], these violations are not sufficient to support a finding that an agency failed to provide a [FAPE]." 309 F.3d 184, 190 (4th Cir. 2002) (quoting *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997)). The court also

reiterated that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief," even where the procedural violation "causes interference with the parents' ability to participate in the development of their child's IEP." *Id.* at 190–91; *see also A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (noting that procedural violations are subject to "harmlessness analysis," while substantive violations of the IDEA are not).

Here, the ALJ heard five days of testimony from eight expert witnesses and two non-expert witnesses, reviewed numerous exhibits, and issued a comprehensive 69-page opinion detailing her factual findings and conclusions of law. *See* ECF No. 30-2: *see also E.P.*, 2017 WL 3608180, at *8 (noting that "the ALJ heard three days of testimony from three expert witnesses, reviewed numerous exhibits, and issued a comprehensive 56-page opinion detailing his factual findings and conclusions of law"); *Sch. Bd. of the City of Suffolk v. Rose*, 133 F.Supp.3d 803, 821–25 (E.D.Va. 2015) (finding that hearing officer's findings of fact were entitled to due weight where hearing officer "heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary evidence; ruled on objections; . . . and rendered a written final decision."); *T.B. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*, GJH-15-03935, 2016 WL 7235661, at *6 (D.Md. Dec. 13, 2016), *appeal dismissed sub nom. T.B., Jr. v. Prince George's Cty.* (2017), *and appeal docketed*, No. 17-1877 (2017). Nevertheless, Plaintiffs argue that Defendant committed procedural violations of the IDEA by not recording R.'s hours of specialized instruction consistent with State guidelines, destroying notes on R.'s progress, and making changes to the IEP and R.'s placement without holding an IEP meeting. Defendant

counters that there were no procedural violations and to the extent that there was such a violation, any procedural violation was harmless. The Court agrees with Defendant.

> a. The ALJ correctly determined that Defendant did not procedurally violate IDEA by recording hours of specialized instruction on the IEP in a manner which differed from the MSDE's guide.

Defendant contends that Mr. K controverted his testimony about the listing of special education hours in R.'s IEP and the ALJ properly addressed the issue in her decision. ECF No. 30-1 at 17–18. Plaintiffs argue that Defendant's decision to not follow the MSDE Statewide Individualized Education Program Process Guide "significantly impeded the Parents' right to participate in the decision-making process because it provided an inaccurate description of the instructional hours R.F. was to receive as well as the location of where her special education instruction would be delivered." ECF No. 31-1 at 22. The Court agrees with Defendant.

Here, the December 2016 IEP identifies eight hours and forty-five minutes of specialized instruction per week. ECF No. 30-2 at 23. Plaintiffs are correct that Mr. K testified that R.'s special education service hours in her IEP were inadequate and the result of a clerical error, but Mr. K later testified that Defendant calculated its hours unlike many other school systems and that he recanted his testimony. *See id.* at 57. In determining the adequacy of R.'s special education service hours, the ALJ first examined the MSDE's guide, as directed by Plaintiffs, and considered the requirements of the guide compared to the Code of Maryland Regulations ("COMAR"), which Defendant argues it adheres to with its calculation method of service hours. *Id.* at 55–57. The ALJ then weighed Mr. K's unfamiliarity with Defendant's calculation method at the beginning of the school year when he was new with what another special education teacher later told him and how Mr. K "recanted his earlier testimony about the hours being erroneous," concluding as follows:

> This change in Mr. K's testimony showed that he was ill informed
> about the way [Defendant] records service hours on the IEP. My
> conclusion from observing all of Mr. K's testimony is that he was
> truthful on both days. He testified honestly and the first time that
> there must be an error on the IEP, which couldn't help
> [Defendant's] presentation in this case. If Mr. K was going to lie
> under oath, I do not think he would do so in a manner that harmed
> his employer's case. I did not sense any reticence or rehearsed
> language in Mr. K's subsequent testimony, so I conclude that he
> made an honest mistake in his initial testimony.

*Id.* at 57. The ALJ proceeded to weigh the testimony of Plaintiffs' two experts who testified that

the total number of service hours on R.'s IEP was inadequate, discounting both opinions because

their testimony "was based on an incorrect understanding of the way [Defendant] records service

hours." *Id.* The ALJ further credited the testimony of Defendant's expert who testified that

Defendant "follows COMAR, not the guide, which is not a regulation," and has never been told

that the way Defendant records special education service hours is wrong or violates the law by

the MSDE during any of its yearly audits. *Id.* at 57–58. Therefore, the ALJ "conclude[d] that

[Plaintiffs] failed to show that [Defendant] improperly recorded the number of special education

service hours on R.'s IEP. *Id.* at 58. Based on the foregoing, the ALJ properly addressed the

conflicting testimony, finding Mr. K credible and explaining her reasons for finding Plaintiffs'

witnesses not credible on this issue, a determination that is due deference. *See* ECF No. 30-2 at

40–42 (discussing the ALJ's credibility determinations of all witnesses); *see also M.C.*, 2014 WL

7404576, at *16 (rejecting a challenge to the ALJ's credibility determinations concerning

witnesses where the plaintiffs had "not presented any evidence that the ALJ's credibility

determinations were anything other than regularly made—he took testimony from the witnesses;

reviewed their credentials, reports, and other evidence presented; and then determined based on

these factors which testimony was most persuasive"). "[I]n according 'due weight' to the

findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses." *E.P.*, 2017 WL 3608180, at *8 (quoting *Wagner*, 340 F.Supp.2d at 611).

Plaintiffs also argue that Defendant's manner of recording R.'s service hours on her IEP was so unclear and confusing that it denied them the ability to participate in the IEP process. ECF No. 31-1 at 32. To support their position, Plaintiffs point out that even Mr. K and Plaintiffs' experts were confused about the recording methodology before it was explained to them. *Id.* Plaintiffs argue that the ALJ's finding that Defendant was not required to follow the MSDE guide "ignored the well-established rule that courts should look to the agency's interpretation of its own regulations when determining whether there has been compliance with the regulatory requirements." *Id.* at 33. The ALJ, however, determined that the IEP was sufficient based on the fact that the number of hours of services for R. was increased in the revised December 2016 IEP and that such a change is not "proof of any defect in the May 2016 IEP" because the May 2016 IEP must be judged as of the time it was adopted. ECF No. 30-2 at 55. After a thorough review of the evidence, the Court cannot conclude, as Plaintiffs do, that there was no evidentiary support for the ALJ's conclusions.

Moreover, "failure to perfectly execute an IEP does not necessarily amount to the denial of a [FAPE]." *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011). However, a material failure to implement an IEP or a failure to implement a material portion of an IEP can amount to a violation of the IDEA. *Id.* The Fourth Circuit has held that failing to provide the hours of therapy required by an IEP did not mean that the school district failed to properly implement a material portion of the IEP and deny the student a FAPE. *Id.* at 485–86. Here, Defendant provided R. with more hours of special education services than required by the IEP, and thus, the ALJ did not err in determining that R. received a FAPE.

22

b.  The ALJ correctly determined that the destruction of the notes on R.'s progress did not deny R.'s parents the ability to participate in the IEP decision-making process.

Plaintiffs argue that they were "denied participation in the decision-making process by [Mr. K.]'s destruction of the data used to measure [R.'s] progress." ECF No. 31-1 at 23. Specifically, Plaintiffs contend that "[t]he ALJ's decision was not regularly made as she failed to recognize and address this serious procedural violation." *Id.* at 24. The Court disagrees.

Contrary to Plaintiffs' argument, the ALJ's decision discussed Mr. K's notes in great detail, stating as follows:

> The Parents attacked Mr. K.'s credibility and argued that I should give his testimony no weight. The IEP provides that progress on the goals and objectives is to be measured by data collected by school staff. [Plaintiffs' attorney] accused Mr. K. of destroying his progress notes in order to prevent the Parents from obtaining evidence for use in this proceeding. He argued that the destruction of the progress notes renders Mr. K. a wholly unreliable witness. I disagree.
>
> [Defendant] has a policy of requiring all special educators to take notes twice a quarter and to maintain their notes of a student's progress for two years. Mr. K. testified that he did not know that was the policy and, as he has never kept his notes after writing progress reports for a student's IEP, he did not keep his notes on R.'s progress once he wrote her quarterly reports. Mr. K. explained that was his practice in his prior employment. Now he knows that the practice did not comport with the record retention policies of [Defendant].
>
> I conclude that Mr. K. violated the retention policy, but I further conclude that he did not do so for any nefarious purpose. Ms. Mastrilli[, Defendant's Program Facilitator for Special Education,] testified that she came to the classroom and observed Mr. K. taking notes on R.'s progress, and she reviewed his notes from time to time as part of her supervisory responsibilities. Mr. K. would know that Ms. Mastrilli was checking his notes because she did so in his classroom. It would not serve Mr. K.'s purposes or support him in his role as a subordinate to Ms. Mastrilli to intentionally destroy notes in violation of a policy. There is no evidence that Ms. Mastrilli was a party to intentional destruction of evidence or covering up the same. While it is understandable that the Parents are frustrated and suspicious of the missing raw data,

which they hoped would support their position on behalf of R., I
conclude that the raw data was innocently discarded, and I decline
to take a negative inference.

[One of Plaintiffs' experts] was critical of the data
collection methods used by [Defendant] as insufficiently planned
and consistent. In her opinion, data should be collected throughout
the school day every day. [Plaintiffs' other expert] also criticized
[Defendant's] data collection procedures, opining that R. needs
daily data collection to help the Parents know how she is
performing in relation to her goals and objectives. The IDEA does
not specify how often a school system should collect data or how
long it should be maintained. [Defendant] has a duty to adopt
policies and procedures which are necessary and sufficient to
enable it to implement the IDEA. While more data is obviously
better than less data, I conclude that [Defendant's] data collection
procedures were reasonable, and that [Defendant] did not falsify
the Student's progress reports. I will therefore defer to the
judgment of the school administration regarding the frequency of
the data required to be collected regarding students with IEPs.

ECF No. 30-2 at 52–53 (internal record citations omitted).

"Parents and guardians play a significant role in the IEP process." *Schaffer ex rel.
Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Accordingly, "IDEA provides a panoply of
procedural rights to parents to ensure their involvement in decisions about their disabled child's
education." *Sellers ex rel. Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 527 (4th
Cir. 1998). Through these procedures, IDEA "guarantees parents both an opportunity for
meaningful input into all decisions affecting their child's education and the right to seek review
of any decisions they think inappropriate." *AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d
674, 678 (4th Cir. 2004) (quoting *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)); *see also Endrew
F.*, 137 S.Ct. at 994 ("These procedures [for drafting an IEP] emphasize collaboration among
parents and educators and require careful consideration of the child's individual circumstances."
(citing 20 U.S.C. § 1414)). "This includes the 'opportunity to present complaints with respect to
any matter relating to the identification, evaluation, or educational placement of the child.'" *AW*,

372 F.3d at 678 (emphasis omitted) (quoting 20 U.S.C. § 1415(b)(6)). "However, to the extent that the procedural violations did not actually interfere with the provision of a [FAPE], these violations are not sufficient to support a finding that an agency failed to provide a [FAPE]." *Gadsby*, 109 F.3d at 956.

Of note, in *L.M.H. v. Arizona Department of Education*, the court distinguished a minor violation where the school failed to comply with a request for records before an IEP meeting from another case where "the school withheld vital information about a student's autism for over a year and lied about test results, likely severely setting back the child's development." No. CV-14-2212-PHX-JJT, 2016 WL 3910940, at \*7 (D.Ariz. July 19, 2016) (citing *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 893 (9th Cir. 2001)). In that case, like in this case, the student's mother attended the IEP meeting and contributed significantly to the discussion about creating the IEP. *Id.* Accordingly, the court determined that the school committed a procedural error by not providing the requested records before the IEP meeting, but that error did not rise to the level required to seriously infringe on the parents' participation. *Id.* The same is true in this case, making Defendant's failure to provide reports a harmless error.

> c. The ALJ correctly found that although, Defendant procedurally violated IDEA by unilaterally making changes to R.'s IEP and placement without holding an IEP meeting, such changes did not substantively deny R. a FAPE.

Defendant argues that the ALJ correctly determined that although Defendant procedurally violated IDEA by not holding an IEP meeting before making changes to R.'s IEP and placement, such violation did not substantively deprive R. a FAPE. ECF No. 30-1 at 21. Plaintiffs disagree. ECF No. 31-1 at 20–22. Here, the ALJ found as follows:

> I conclude that [Defendant] violated the IDEA by changing the location where R.'s services were provided from the third week of the school year until the December 2016 IEP revision by

removing her from receiving academic instruction in the general
education classroom. [Defendant] failed to provide the Parents
with prior notice of this change as required by IDEA[.]

. . . .

Having concluded that [Defendant] violated the procedural
requirements of IDEA in this manner, I must determine whether
this violation denied R. an educational opportunity or if it was a
technical violation of the IDEA. The law in this Circuit on this
issue is clear:

> If a disabled child received (or was
> offered) a FAPE in spite of technical
> violation of the IDEA, the school
> district has fulfilled its statutory
> obligations.

I conclude that providing more special education services
in the ICSC did not interfere with the provision of a FAPE to the
Student. Mr. K testified credibly that R. was having difficulty
spending time in the general education setting. In his view, she got
more out of the time in the ICSC. Mr. K should have requested,
and [Defendant] should have scheduled, an IEP team meeting to
amend the service hours and placement sections of R.'s IEP.
However, the failure to do so under the circumstances of this
case—particularly where the Parents contend that a separate day
school for disabled children is the proper placement—amounts to a
technical violation of the IDEA, not a denial of a FAPE.

ECF No. 30-2 at 58–59 (internal citations omitted).

Plaintiffs, who carry the burden of proof, have failed to demonstrate that Defendant's

failure to convene an IEP meeting with Plaintiffs denied R. a FAPE. As discussed above,

"[p]arents and guardians play a significant role in the IEP process." *Schaffer*, 546 U.S. at 53.

However, "[i]f a disabled child received (or was offered) a FAPE in spite of a technical violation

of the IDEA, the school district has fulfilled its statutory obligations." *Snyder ex rel. Snyder v.*

*Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *8 (D.Md. Sept. 29,

2009) (quoting *MM*, 303 F.3d at 534). Because Defendant's failure to hold an IEP meeting had

no impact on whether the 2016–2017 IEP assured R. of a FAPE,[6] the Court agrees with the ALJ

that the procedural violations at issue are insufficient to support a finding that Defendant failed

to provide R. a FAPE. *See Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F.Supp.2d

565, 580 (D.Md. 2004); *see also DiBuo*, 309 F.3d at 191 (rejecting the plaintiffs' "propose[d]

broad legal rule to the effect that a procedural violation of the IDEA (or one of its implementing

regulations) that causes interference with the parents' ability to participate in the IDEA process

*per se* constitutes a denial of a FAPE to the disabled child at issue").

      2. The ALJ correctly determined that R.'s IEP was substantively adequate.

      As discussed above, the Supreme Court has held that an IEP as proposed by a local

education agency must be "reasonably calculated to enable the child to receive educational

benefits." *Rowley*, 458 U.S. at 207. As this Court further explained in *King v. Board of

Education of Allegany County*, "[t]he lynchpin of the IDEA is its requirement that disabled

children be provided with a [FAPE]." 999 F.Supp. 750, 766 (D.Md. 1998) (citation and internal

quotation marks omitted). Interpreting Fourth Circuit precedent, *King* held that "there is no

requirement that the state provide the child with the best education—public or private—that

money can buy, nor is the state required to maximize the potential of the student. All that is

required is that the disabled child benefit educationally from the program." *Id.* (internal citations

omitted). "In other words, the IDEA does not mandate that every possible special service be

offered to a disabled student . . . ." *M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No.

RDB-09-3365, 2011 WL 2709196, at *11 (D.Md. July 11, 2011) (emphasis omitted) (citing

*Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996 (4th Cir. 1997)). "[O]nce a procedurally

proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the

---

[6] As discussed below, the ALJ properly found that the ICSC was an appropriate placement as
part of R.'s IEP and offered R. a FAPE.

judgment of education professionals." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325–26 (4th Cir. 2004) (quoting *Tice ex rel. Tice v. Botetourt Cty. Sch. Bd.*, 908 F.2d 1200, 1207–08 (4th Cir. 1990)).

Defendant argues that Plaintiffs have failed to present evidence to demonstrate that it denied R. a FAPE by failing to properly implement her IEP. ECF No. 30-1 at 22. On the other hand, Plaintiffs argue that the IEP was not properly implemented and that R. did not receive an educational benefit; therefore, she was not receiving a FAPE. ECF No. 31-1 at 27–37. Specifically, Plaintiffs contend that the IEP was substantively deficient because Defendant's staff failed to follow the BIP requirement, R.'s placement was improper, the IEP contained inadequate hours of special education instruction, and the IEP goals and R.'s progress during the 2016–2017 school year were inadequate. *Id.* at 28–37. The ALJ addressed each of Plaintiffs' concerns in her decision, finding that the IEP was appropriate and reasonably calculated to provide educational benefits to R. ECF No. 30-2 at 68.

As discussed above, this court "must make an independent decision based on a preponderance of the evidence, while giving due weight to the state administrative proceedings." *Sanger v. Montgomery Cty. Bd. of Educ.*, 916 F.Supp. 518, 520 (D.Md. 1996). Further, the ALJ's findings are to be considered *prima facie* correct when made in the course of the normal fact-finding process. *See Doyle*, 953 F.2d at 105. The determination of whether an IEP is adequate "is itself a question of fact." *M.L.*, 867 F.3d at 493. Applying these standards to this case, the Court finds that the ALJ's findings are well-documented and, thus, entitled to *prima facie* correctness, and that Plaintiffs have not rebutted this presumption.

First, the ALJ determined that despite issues with the implementation of R.'s BIP requirement, principally the use of the NovaChat, Defendant provided R. a FAPE, concluding

that the NovaChat "was reasonably available to and used by R." ECF No. 30-2 at 60. Defendant argues that the ALJ properly addressed R.'s access to and use of her NovaChat and determined that the failure to make the NovaChat available at all times did not deprive R. a FAPE. ECF No. 30-1 at 22–23. Plaintiffs counter that the ALJ erred in finding the BIP appropriate because the BIP only addressed R.'s biting and not her other interfering behaviors during the 2016–2017 school year.[7] ECF No. 31-1 at 24–26.

The ALJ thoroughly explained her conclusion that the BIP was appropriate over several pages of her decision. ECF No. 30-2 at 59–65. The ALJ first acknowledged the IEP's requirement that R. have the NovaChat in order to learn how to communicate and to enable her to participate in classroom activities and that Mrs. F. and her expert witness credibly testified about their classroom observations where R. mostly had access to the NovaChat. *Id.* at 59–60. Specifically, R. mostly had the NovaChat or was given the NovaChat by Mr. K in order to communicate about her requests for food, drink, and breaks, but sometimes, such as in music class, the NovaChat was not near where R. could easily access it. *Id.* at 60–61. When a challenging behavior arose in music class, however, the NovaChat would be brought to R. *Id.* at 61. Nonetheless, the ALJ concluded that the NovaChat "was reasonably available to and used by R" and that "there are practical reasons for some of the times when the NovaChat was not available," including the times when the NovaChat was broken and when R. attended her physical therapy sessions. *Id.* at 60–62. The ALJ reasoned that R. had other communication

---

[7] Plaintiffs also argue that the ALJ erred procedurally by mistakenly believing that an independent psychologist from Kennedy Krieger Institute conducted an FBA and developed a BIP for R. when it was actually conducted by a psychologist who had previously worked for Kennedy Krieger and now worked with Defendant. ECF No. 31-1 at 25. However, looking at all of the evidence, the ALJ did not seem swayed by the mere fact that the FBA was created by a psychologist, but rather focused on the fact that the IEP team had the FBA report and considered it in creating R.'s IEP. Plaintiffs offer no evidence to suggest that the report was insufficient and no other FBA was requested or conducted.

methods available to her during these times, such as her body language, facial expressions, and picture cards to initiate activities, and that her BIP employed other communication strategies, such as designated transition objects, a consistent daily routine, and social stories, which were properly implemented. *Id.* at 62–63. Thus, "[t]aking all of this evidence into consideration, [the ALJ] conclude[d] that the NovaChat [wa]s being used appropriate and as often as possible under the unique circumstances presented by R., and therefore in accordance with the IEP." *Id.* at 62. Furthermore, "[e]ven if the NovaChat was not accessible to R. at all times as required by the BIP, that does not prove a denial of FAPE" as "[t]he periodic absence of the NovaChat was a de minimis failure to implement her IEP." *Id.* at 63. Based on the record presented to the ALJ, the "*de minimis*" deviation from the BIP requirement regarding R.'s access to and use of the NovaChat does not constitute a failure to provide a FAPE.

In addition, while Plaintiffs are correct that the BIP only addressed R.'s biting, Plaintiffs fail to offer any theory for the inclusion in the 2016–2017 school year's BIP of other behaviors which R. exhibited during the 2016–2017 when the BIP was created before the 2016–2017 school year. The IEP team cannot be faulted for their inability to foresee that R. might develop additional interfering behaviors. *See* ECF No. 30-2 at 45 ("Many courts have emphasized that the IEP is a forward looking document, a plan for the student's future. The IEP team gathers all relevant information available and documents a student's present levels of academic achievement and functional performance, and then proceeds to define a program to meet the student's need *in the coming school year*." (emphasis in original)); *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009) ("Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calculated to enable the child to receive

educational benefits.'" (citations omitted)). The presence of additional interfering behaviors during the 2016–2017 school year could not be considered in April 2016, when the IEP was created to afford educational benefits to R., but rather would be considered for a subsequent BIP. The ALJ properly articulated this conclusion in her decision, noting that "[a] student's behavior may and often does change over time," but "[t]he law does not require a public school system to write a FBA or a BIP every time a new interfering behavior is observed." *Id.* at 47–48. As the ALJ properly noted, Plaintiffs presented nothing to indicate that the FBA and BIP were inappropriate at the time they were created in April 2016. *Id.* at 49. Accordingly, the ALJ properly considered the evidence in the record and did not err in concluding that the BIP was appropriate for R.

Second, regarding R.'s access to other students, Congress has a preference towards mainstreaming disabled children with their nondisabled peers to the highest extent possible. *S.A. v. Weast*, 898 F.Supp.2d 869, 882 (D.Md. 2012). Thus, IDEA requires that the educational benefit of the IEP must be provided in the least restrictive environment and that the student must participate to the "maximum extent appropriate" in the same activities as her nondisabled peers. 20 U.S.C.A. § 1412(a)(5)(A) (West 2018); *see, e.g.*, *DeVries ex rel. DeBlany v. Fairfax Cty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989) (holding that "[m]ainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act"). However, "the preference for mainstreaming does not outweigh the need to provide a child with an appropriate education." *Taylor ex rel. Dolch v. Sandusky*, No. CCB-04-301, 2005 WL 524586, at *4 (D.Md. Mar. 4, 2005) (citing *Carter ex rel. Carter v. Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991), *aff'd*, 510 U.S. 7 (1993)). Moreover, "failure to

perfectly execute an IEP does not necessarily amount to the denial of a [FAPE]." *Heffernan*, 642

F.3d at 484. A material failure to implement an IEP or a failure to implement a material portion

of an IEP, however, can amount to a violation of the IDEA. *Id.*

Here, the ALJ found as follows:

> I conclude based on all the evidence that [Defendant] acted in good
> faith in creating the ICSC in 2016 and in assigning R. to it.
> [Defendant] thought there would be other students in the class, but
> it did not turn out that way. [Defendant] was not hiding R. from
> her peers; R. was afforded opportunities to interact with other first
> graders, albeit not to the degree [Defendant] would have preferred.

ECF No. 30-2 at 54–55. As the ALJ notes, during the beginning of the 2016–2017 school year,

R. was the only student in the ICSC for several months before another student began attending

the ICSC. *Id.* at 54. R.'s IEP provided that she would spend fourteen hours and thirty-five

minutes with her nondisabled peers in a general education classroom and that for the remainder

of the week, she would receive services outside of the general education classroom, specifically

in the ICSC. *Id.* at 16. Plaintiffs do not indicate how much time R. would spend with her

disabled or nondisabled peers at The Benedictine School, except that there would be four other

disabled students in R.'s class at The Benedictine School. ECF No. 31-1 at 31. The ALJ

determined that R's placement in the ICSC provided her with an appropriate education because it

enabled her to remain focused and attentive. *See* ECF No. 30-2 at 23. Furthermore, while R.

was in the ICSC, she received the services contained in her IEP and still interacted with her peers

during the day, although less frequently than in a general education classroom. Under these

circumstances, the Court determines that the evidence was sufficient to support the ALJ's

conclusion. *See Heffernan*, 642 F.3d at 488–89 (finding that a home placement was appropriate

where the student was taken to parks and into the community for social interactions on a daily

basis); *I.S.*, 325 F.Supp.2d at 580–81 (determining that the child's behavior and distractibility in

the general education setting during the beginning of the school year, including spitting and hitting peers and refusing teachers' directions, demonstrated the inappropriateness of an inclusive placement for the school year). Therefore, the ALJ did not err by determining that R.'s placement was reasonably calculated to enable her to receive educational benefits. The court's independent review of the record confirms that there was an evidentiary basis for the ALJ's conclusion that R.'s placement was reasonably calculated to afford her a FAPE, which is all that the IDEA mandates. *See Y.B. v. Bd. of Educ. of Prince George's Cty.*, 895 F.Supp.2d 689, 706 (D.Md. 2012) (citing *Rowley*, 458 U.S. at 201).

Third, regarding the listing of special education hours in R.'s IEP, Plaintiffs argue that the specified hours—eight hours and forty-five minutes—are insufficient to provide R. a FAPE. ECF No. 31-1 at 30. Plaintiffs distinguish the adequacy of the hours in the IEP from the separate issue of the way that Defendant determines service hours, which is discussed above. IDEA requires an IEP to provide a "basic floor of opportunity that access to special education and related services provides." *S.A.*, 898 F.Supp.2d at 881 (quoting *Tice*, 908 F.2d at 1207). Plaintiffs advocate for a maximizing education for R. in a private education program, and though the IEP does not guarantee as many hours of instruction as R. received, the IEP is reasonably calculated to provide a "basic floor of opportunity" to enable R. to receive educational benefits with respect to her goals and objectives. Additionally, as discussed above, the ALJ properly weighed the conflicting testimony regarding the adequacy of R.'s service hours, found Mr. K credible and that he was mistaken, but honest with his initial testimony, and thoroughly explained her reasons for finding Plaintiffs' witnesses not credible on this issue, determinations that are due deference. *See* ECF No. 30-2 at 40–42 (discussing the ALJ's credibility determinations of all witnesses); *see also M.C.*, 2014 WL 7404576, at *16 (rejecting a challenge

to the ALJ's credibility determinations concerning witnesses where the plaintiffs had "not presented any evidence that the ALJ's credibility determinations were anything other than regularly made—he took testimony from the witnesses; reviewed their credentials, reports, and other evidence presented; and then determined based on these factors which testimony was most persuasive"). Therefore, the Court holds that the ALJ did not err in determining that the IEP provided R. with a FAPE as required by IDEA.

Finally, regarding R.'s IEP goals and progress during the 2016–2017 school year, the administrative record supports the ALJ's finding that the IEP goals were appropriate and that the services provided to R. were sufficient to address those goals. Defendant points to the ALJ's reasoning regarding R.'s incremental progress on some, but not all of her goals, and disagrees with Plaintiffs that R.'s IEP is inappropriate because R did not show progress on all of her goals and the IEP did not specify a social goal. *See* ECF No. 31-1 at 35.

The Fourth Circuit acknowledged that in assessing an IEP's appropriateness, "the courts should endeavor to rely upon objective factors, such as actual educational progress." *S.A.*, 898 F.Supp.2d at 879 (quoting *MM*, 303 F.3d at 532). In *Endrew F.*, the Supreme Court recently held that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S.Ct. at 999. Thus, an "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." *Id.* at 1000. Moreover, in the recent case of *M.L.*, the Fourth Circuit characterized *Rowley*, 458 U.S. 176 (1982), as the "leading IDEA case." *M.L.*, 867 F.3d at 494. Explaining *Rowley*, the Fourth Circuit said that a FAPE "did not mandate 'equality' or any requirement that schools provide the same education to students with disabilities as that provided to students without disabilities." *Id.* at 495 (quoting *Rowley*, 458

34

U.S. at 198). Rather, "a school is required only to provide 'equal access.'" *Id.* (quoting *Rowley*, 458 U.S. at 200) (emphasis omitted).

Here, the IEP was "reasonably calculated to enable [R.] to receive educational benefits." *Rowley*, 458 U.S. at 207. "Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions as long as an IEP provided the child 'the basic floor of opportunity that access to special education and related services provides.'" *Tice*, 908 F.2d at 1207 (quoting *Rowley*, 458 U.S. at 201); *see MM*, 303 F.3d at 526 ("The IDEA does not . . . require a school district to provide a disabled child with the best possible education." (citing *Rowley*, 458 U.S. at 192)). In this case, the ALJ determined that "[t]he goals and their objectives set forth targets for R. to perform," making them definite enough for progress reports. ECF No. 30-2 at 52. The Court agrees with the ALJ that the IEP goals were measurable because one of Plaintiffs' experts was able to discuss the progress reports for those goals and did not explain how she would have written the goals differently. *See* ECF No. 30-2 at 51–52. In the absence of an alternative method, the ALJ properly deferred to the educators' decisions regarding the IEP.

The ALJ further considered the rarity of R.'s genetic disease and the resulting uncertainty about her cognitive and educational potential as well as R.'s parents' inability to provide any evidence that they requested that Defendant perform a study of R.'s levels of performance and that Defendant refused. ECF No. 30-2 at 66. The ALJ noted that R.'s "IEP goals and objectives at this point are educated judgments about future events," but that she has made progress since kindergarten, which "is appropriate given her unique circumstances." *Id.* at 67. The ALJ further explained R.'s progress, stating that R. "can be unpredictable, and sometimes she shows signs of progress but at other times there is regression." *Id.* at 66. Regarding the goals which had not

shown progress, the ALJ stated that "[t]hese goals may have to be carried over in [R.'s] next IEP
. . . [;] [h]owever, at this time, the goals remain appropriate." *Id.* at 67. For these reasons, the
ALJ's findings of fact and conclusions of law in reference to R.'s progress were detailed,
supported by the record, and entitled to deference.

Regarding the lack of a social goal in the IEP, the ALJ acknowledged that while "the IEP
[wa]s not perfect," it nonetheless was reasonable. ECF No. 30-2 at 50–51. In particular, the ALJ
considered the IEP as a whole and how the IEP gives R. opportunities to socialize with other
students, custodians, and staff, despite the lack of an explicit social goal. *Id.* As the ALJ stated
in her decision, "an IEP is not required to contain every goal from which a student might
benefit." *Id.* at 51; *see also Rowley*, 458 U.S. at 199. Thus, Defendant did not commit a
substantive violation by concluding that the IEP was reasonably calculated to provide
educational benefits to R. with respect to her goals and objectives.

## B. Plaintiffs Cannot Establish That Defendant Discriminated Against R. Solely Based On Her Disability.

Federal regulations have interpreted § 504, which prohibits discrimination against people
with disabilities, 29 U.S.C. § 794(a), to require public schools to provide children with
disabilities a FAPE, 34 C.F.R. § 104.33. To establish a violation of § 504 and its implementing
regulations, Plaintiffs must show that R. was discriminated against solely on the basis of her
disability. *Sellers*, 141 F.3d at 528; *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265
(4th Cir. 1995). In *Sellers*, the United States Court of Appeals for the Fourth Circuit held that, in
the specific context of a claim that a school system has not provided a free appropriate education
to a child with a disability, a finding of discrimination based on disability requires a showing of
bad faith or gross misjudgment by the school system. *Sellers*, 141 F.3d at 529; *see also
Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982) ("[E]ither bad faith or gross

misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.").

Here, R.'s disability is undisputed and no dispute has been raised as to whether R., as a public school student, was eligible for public education in Cecil County. Thus, the only dispute arises from whether R. either was excluded from participation in or denied public education or was otherwise discriminated against on the basis of her disability. All parties assert no genuine dispute of material fact exists on this third element.

First, considering Defendant's Motion, Defendant argues that Plaintiffs cannot establish that Defendant engaged in intentional discrimination against R. and acted with bad faith or gross misjudgment. ECF No. 30-1 at 26–28. The Court agrees. Plaintiffs offer no proof that Defendant intentionally discriminated against R. or denied her services because of her disability. *See McGraw v. Bd. of Educ. of Montgomery Cty.*, 952 F.Supp. 248, 254 (D.Md. 1997). Instead, the record shows that Defendant intended to provide R. as well as two other students with instruction in the ICSC during the 2016–2017 school year. ECF No. 30-2 at 22. However, for reasons outside of Defendant's control, the other students who were expected to join R. in the ICSC did not attend, and as a result, R. was the only student in the ICSC until February 2017. *Id.* Whenever Defendant knew that the other two students would not be attending the ICSC with R., it was not then necessary for Defendant to refer R. to a private school, as Plaintiffs argue. *See* ECF No. 35 at 15. Instead, Defendant had the obligation to provide R. with a FAPE, which it determined could be achieved with R. in the ISCS. Besides, despite being alone in the ICSC for her instruction throughout the 2016–2017 school year, R. did have access to her nondisabled peers when she walked to specials, such as gym, art, and music class, attended recess, went on

field trips, attended some reading and math classes, walked around the building every day, and was occasionally joined by a first grade classmate during lunch. *Id.* at 22–23.

Moreover, at best, isolating R. from her peers for much of the school year could only provide some support for denial of FAPE and does not establish discrimination.[8] *See N.T. v. Balt. City Bd. of Sch. Comm'rs*, No. JKB-11-356, 2012 WL 3028371, at *5–6 (D.Md. July 24, 2012) (determining that procedural violations of a disabilities services plan could provide support for denial of FAPE, but not discrimination); *N.T. v. Balt. City Bd. of Sch. Comm'rs*, No. JKB-11-356, 2011 WL 3747751, at *6–8 (D.Md. Aug. 23, 2011) ("Without evidence that the [school board's] important decisions [to suspend a student with a disability for fighting while, among other deficiencies, failing to implement significant portions of the student's 504 plan in high school and altering the plan without the parents' knowledge or involvement] were based upon reason, one could infer that [the student] has been denied educational benefits solely based on his disability."); *Doe v. Arlington Cty. Sch. Bd.*, 41 F.Supp.2d 599, 602, 605–06, 609 (E.D.Va. 1999) (finding no bad faith or gross misjudgment were a school board could support its decision to isolate a student with a developmental disability from nondisabled students for two-thirds of the school week), *aff'd*, 210 F.3d 361 (4th Cir. 2000). Accordingly, Defendant has shown no genuine dispute of material fact exists on Plaintiff's claims of discrimination under § 504 and that, because Plaintiffs cannot establish that Defendant engaged in intentional discrimination against R. with bad faith or gross misjudgment, Defendant is entitled to judgment as a matter of law with respect to this claim. Accordingly, Defendant's Motion will be granted.

Next, considering Plaintiffs' Cross-Motion, Plaintiffs argue that R.'s isolation in her special education class from her peers, particularly "developmentally similar peers," during a

---

[8] As discussed above, however, Defendant provided R. with a FAPE in this case.

portion of the 2016–2017 school year constituted disability discrimination. ECF No. 31-1 at 37–40. Defendant incorrectly responds that Plaintiffs cannot establish a § 504 claim where their only evidence is the ALJ's decision because the ALJ never considered Plaintiffs' § 504 claim, which was outside of the ALJ's jurisdiction. ECF No. 32 at 27–28; *see J.S. III ex rel. J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 984 (11th Cir. 2017) (per curiam). Defendant, however, is correct that it did not intentionally isolate R. from her peers.

Plaintiffs rely on two cases which have considered student isolation in the context of a § 504 claim for disability discrimination. ECF No. 31-1 at 38–39. In the first case, *K.M. ex rel. D.G. v. Hyde Park Central School District*, the court considered a student's isolation at lunch. 381 F.Supp.2d 343, 360 (S.D.N.Y. 2005). In that case, the court considered that "unjustified institutional isolation of persons with disabilities is a form of discrimination" and held that "[e]ating lunch with other students could be considered an integral part of the public school experience, one in which [the student] would be entitled to participate if a reasonable accommodation for his disability would make it possible." *Id.* The court in the second case, *J.S. III, ex rel. J.S. Jr. v. Houston County Board of Education*, found that a student's somewhat frequent exclusion and isolation from his classroom and peers on the basis of his disability implicated "further, intangible consequences of discrimination . . . that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students." 877 F.3d at 986–87.

The Court does not find these cases persuasive. Of note, *K.M.* and *J.S., III* both primarily dealt with peer-to-peer harassment or bullying and the school's decision to isolate the disabled student as an inadequate method of ending the harassment. Furthermore, unlike in this case, where Plaintiffs request that the Court grant summary judgment in their favor, in both *K.M.* and

*J.S., III*, the court denied a motion for summary judgment filed by the defendant because the isolation could give rise to discrimination based on disability. As discussed above, however, Plaintiffs cannot establish that Defendant deprived R. of the interaction with her peers because she had the opportunity to interact with her peers, such as during specials, lunch, recess, and walking the hall, encompassing the times and places for students to have the most social interactions. Thus, Plaintiffs' Cross-Motion will be denied.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that, in the light most favorable to Plaintiffs, Plaintiffs have not shown that "the public school system failed to provide a [FAPE]" and discriminated against R. based on her disability. *See Carter*, 950 F.2d at 161. Therefore, Defendant's Motion (ECF No. 30) is GRANTED and Plaintiffs' Cross-Motion (ECF No. 31) is DENIED.

A separate order will follow.

Date: 21 June 2018

A. David Copperthite
United States Magistrate Judge